COMMISSIONERS OF LEWES, a municipal corporation of the State of Delaware;

. *vs.*

BREAKWATER FISHERIES COMPANY, a corporation of the State of Delaware, and THOMAS H. HAYES and RAYMOND J. ANDERTON, doing business as Hayes and Anderton.

*Sussex, June* 28, 1922.

. Chancery will not give relief against mere mistakes of law, but will give relief where the mistake consists, not in an erroneous understanding of the legal effect of the contract agreed on, but in an erroneous understanding of the import of the words selected to express the terms of the contract agreed on.

An agreement to surrender a lease which has fifteen years yet to run is within the statute of frauds.

Where lessee agreed to surrender the lease as to a portion of the property in consideration of a reduction in the rent, a new lease, describing the other portion of the land, and canceling previous leases relative to land "hereinbefore described," will be reformed because of mutual mistake as to the import of the words used, so as to cancel a previous lease as to land therein described in the new lease, though the original contract to surrender prior lease was oral, the agreement being executed.

Quere. May a court of equity on the basis of parol evidence, reform an executory contract relating to land and decree its performance in its reformed condition, there being no elements of special equities such as part performance, and the statute of frauds being applicable and relied upon?

Payment of the consideration is, in Delaware, regarded as such part performance as will take the case out of the statute of frauds.

Lessee's parol agreement to surrender lease as to a portion of the land in consideration of a reduction in the rent *held* not void under the statute of frauds after execution of a new lease as to other portion of the land at the reduced rental, and the collection by lessor of the reduced rental since the payment of the consideration was part performance, taking the contract out of the statute.

Where a partnership was organized merely to acquire a lease to be taken over by a corporation to be organized by the partners for such purpose, and where the stock of the subsequently organized corporation was taken by the partners in such manner that their shares in the corporation were identical with their several interests in the partnership, and the partners became the only directors of the corporation, and were such at the execution of the new lease pursuant to a contract made between the partners and the lessor providing for a surrender of the old lease as to a portion of the land in consideration of a reduction in the rent, the corporation, having accepted the benefits of the contract by acceptance of the new lease, was bound by such contract, so as to warrant the court in reforming the new lease so as to conform thereto.

A corporation may adopt a contract made by its promoters for its benefit, though such contract antedates its existence.

Where lessor and lessee entered into a contract for surrender of lease as to a portion of the land in consideration of a reduction in the rent, and a new lease was executed, describing the other portion of the land, and canceling prior leases relative to "hereinabove described" land, third parties who purchased lessee's plant and the lease, with notice of lessor's claim that the new lease did not cover that portion of the land as to which the lessee had agreed to surrender prior lease, *held* not *bona fide* purchasers as to such portion of the land.

Bill to Reform a Written Lease, made by the complainant to Breakwater Fisheries Company, one of the defendants, of certain lands lying along the Delaware Bay beach in front of the town of Lewes.

On September 4, 1912, the Commissioners of Lewes, a municipal corporation made a lease of certain lands on the beach front to a company known as Delaware Fish Oil Company, at an annual rental of twelve hundred dollars, for a term of twenty-five years commencing January 1, 1912, and ending December 31, 1937. This company was dissolved in 1917, and a portion of its assets, including the lease just mentioned, was sold and duly transferred to Albert W. Robinson. On August 10, 1917, Robinson conveyed to John M. Vessels, Thomas C. Horsey, Lewis W. Mustard, William P. Orr, Jr., Edgar W. Ingram and William H. Virden, each a

one-seventh interest in all the assets, including the lease, which he had acquired from the Delaware Fish Oil Company. Thereafter, by a memorandum of sale, the six persons named together with Robinson, for the consideration of fifty thousand dollars, conveyed the said assets, including the Delaware Fish Oil Company's lease, to the Breakwater Fisheries Company, one of the defendants. This memorandum of sale is dated December 1, 1917. It was acknowledged, however, by the parties thereto on divers dates from December 26, 1917, to January 16, 1918.

Breakwater Fisheries Company was incorporated in 1917, its certificate filed with the Secretary of State on October 1 and recorded on October 5 of that year. Thereafter the complainant executed to this company the lease which the bill seeks to reform. The lease in question is dated November 3, 1917, purports to have been acknowledged by James T. Thompson, president of the Commissioners of Lewes, on that date, and was signed and acknowledged by William P. Orr, Jr., vice-president of the Breakwater Fisheries Company, on December 5, 1918.

The lease from the town to the Breakwater Fisheries Company (hereafter referred to as the new lease) embraces a portion of the land mentioned and described in the earlier lease of the town to the old Delaware Fish Oil Company (hereafter referred to as the old lease). The rental specified in the new lease is twelve hundred dollars for the then current year of 1917, three hundred dollars for each of the years 1918, 1919 and 1920, and five hundred dollars for each year thereafter during the continuance of the lease. Considering the number of years the new lease had to run, the average yearly rental was about five hundred and twenty dollars, as contrasted with twelve hundred dollars yearly rental under the old lease. The terms of the new lease commenced from the date thereof, viz., November 3, 1917, and ended February 1, 1936.

It will, therefore, be noted that Breakwater Fisheries Company as assignee of Robinson, et al., held the old lease covering certain lands at an annual rental of twelve hundred dollars, and, as lessee of the town, held the new lease covering a portion of the same lands at an average rental of five hundred and twenty dollars. The old lease, roughly speaking, embraced about one thousand feet more of beach front than the new lease, the land in the

new lease embracing only that portion of the old tract on which the plant proper of the Delaware Fish Oil Company was located.

The bill charges that the new lease was made as the result of an agreement between the town and the Breakwater Fisheries Company that the latter would surrender to the town the one thousand feet of land lying beyond the plant of the old Delaware Fish Oil Company in return for a reduction in rental from twelve hundred dollars, which was due under the old lease, to the smaller annual sums specified in the new lease. It further charges that the new lease was intended to embody in its provisions a clause surrendering all of the land embraced in the old lease other than that which the new lease specifically described, that is, the thousand feet above referred to.

Paragraph four of the new lease is as follows:

"Fourth: All leases or agreements relative to the occupancy of the land and premises hereinabove described made between the parties hereto or their predecessors in title, are hereby canceled and made null and void."

The bill charges that this paragraph was put in the form in which it appears through error and mistake; that it does not express what the parties intended it to express, and that it should have been worded in substance so as to provide, not that former leases relative only to the land "hereinabove described" were canceled, but that all leases theretofore made by the parties, or their predecessors, were canceled and all lands embraced in such former leases were surrendered to the town except the lands "hereinabove described." In other words, it is claimed that the cancellation of all former leases should have been so provided for that the thousand feet of disputed land was surrendered to the town as it is charged the agreement contemplated. The alleged error in the new lease is charged to have been due to the mutual mistake of the parties and the court is asked to direct a reformation of the instrument in accordance with the true intent and purpose of the parties.

The defendants by their answer deny the alleged agreement, namely, that the town was to reduce the annaul rental in return for a surrender of the thousand feet of land. They further say that, if such agreement was made, it was in parol and, being so, they set up the statute of frauds against it.

Hayes and Anderton are made parties defendant because they claim to be the present owners of the rights of Breakwater Fisheries Company as purchasers thereof, though they have not yet paid in full therefor, nor have they as yet received a formal transfer thereof, their rights being evidenced by a contract of sale. In their answer, they set up as a defense, peculiar of course to themselves, that they are purchasers for value without notice.

The cause was heard on bill, answers, testimony of witnesses heard orally by the Chancellor and exhibits.

*Caleb S. Layton*, of the firm of Marvel, Marvel, Layton and Hughes, for the complainant.

*James M. Tunnell*, for the defendants.

The Chancellor. The complainant's case is constructed on the assumption that the new lease, by reason of mutual mistake, failed to correctly state the terms of the agreement made by the parties. That the new lease correctly stated all of the terms agreed on, except one, is admitted. That one is that it did not provide for a surrender of the thousand feet of land embraced in the terms of the old lease.

In *Cannon v. Collins*, 3 *Del. Ch.* 132, 152, Chancellor Bates, in speaking of the powers of a court of equity, says:

"One of its most important powers is to reform contracts, where the parties, by mistake, have failed to stipulate in terms according to their real intentions."

Chancery will not, however, as a general proposition, relieve against mere mistakes of law. Where the written document accurately expresses the contract which the parties intended to make, the fact that they were mistaken as to the legal effect of their contract will not justify a court of equity, in the absence of any other circumstances, in interposing its remedies against it. In such case, the mistake is purely one of law and not remediable in equity. It was so held in the leading case of *Hunt v. Rhodes*, 1 *Pet.* 13, 7 *L. Ed.* 27.

Where the mistake, however, consists not in an erroneous understanding of the legal effect of the contract agreed upon, but in an erroneous understanding of the import of the words selected

to express the terms of the contract agreed on, equity will inter-pose its relief. It was so held in another leading case decided by the Supreme Court of the United States. *Griswold v. Hazard*, 141 *U. S.* 260, 11 *Sup. Ct.* 972, 999, 35 *L. Ed.* 678.

The distinction which these two cases in the Supreme Court of the United States would seem to draw is between a mistake of law, which underlies the making of the contract, and a mistake concerning the legal import of words, which underlies the manner of expressing the contract. The latter is remediable; the former is not.

In *Minot v. Tilton*, 64 *N. H.* 371, 10 *Atl.* 682, the court approvingly quotes the following from 2 *Pomeroy's Equity Jurisprudence*, § 845:

"If a written instrument fails to express the intention which the parties had in making the contract which it purports to contain, equity will grant its relief, affirmative or defensive, although the failure may have resulted from a mistake as to the legal meaning and operation of the terms or language employed in the writing."

Numerous authorities may be cited in support of this proposition. I have been at some pains to examine a great many of them, and the principle embodied in the proposition is overwhelmingly established. The case of *Cannon v. Collins, supra*, in our own state, is in harmony with it. Indeed, I do not understand the defendants to seriously combat the principle thus laid down in general terms. They contend, however, that the pending case has features which render improper its application. These features will now be discussed.

It is contended that, though a written agreement may be reformed because of a mistake in the manner of its wording, yet such reformation may not be had on parol evidence where the subject-matter of the agreement is within the statute of frauds. The primary agreement alleged to have been made between the lessor and lessee in this case rested in parol. The particular in which the written lease is said not to properly embody the prior oral agreement is in this—that it did not provide for the surrender of the old lease. It has been held in this state that an agreement to accept a surrender of a lease is within the statute of frauds and must be in writing. *Logan v. Barr*, 4 *Har.* 546. Likewise the con-

240    COM'RS·OF LEWES.. vs. BREAKWATER FISHERIES CO.

Opinion.

verse has been held, namely, that an agreement to execute a lease for five years is within the statute. *Matthes v. Wier*, 10 *Del. Ch.* 63, 84 *Atl.* 878. An agreement, therefore, to surrender the old lease, which had something like fifteen years yet to run, would be within the terms of our statute of frauds.

Inasmuch as the alleged original agreement which provided for a new lease and a surrender of the old lease is not evidenced by a writing, it is contended that under the statute of frauds no relief can be afforded. The authorities pertinent to the question thus raised are not uniform.

Against the contention of the defendants, the weight of the opinion of so great an equity judge as Chancellor Kent is found reported in *Gillespie v. Moon*, 2 *Johns. Ch.* 585. That was a case in which a bill was filed to reform a deed which it was charged mistakingly conveyed two hundred and fifty acres of land, whereas it was meant to convey only two hundred acres of land. The agreement which preceded the execution of the deed rested in parol. The Chancellor decreed that the deed should be reformed and to that end ordered that the defendant release and convey to the complainants the fifty acres of land which, by reason of mistake, had been included in the deed. In the course of his opinion he said:

"I have looked into most, if not all, of the cases on this branch of equity jurisdiction, and it appears to me to be established, and on great and essential grounds of justice, that relief can be had against any deed or contract, in writing, founded in mistake or fraud. The mistake may be shown by parol proof, and the relief granted to the injured party, whether he sets up the mistake affirmatively, by bill, or as a defense."

*Glass v. Hulbert*, 102 *Mass.* 28, 3 *Am. Rep.* 418, is a leading case which takes a view somewhat contrary to that of Chancellor Kent in *Gillespie v. Moon, supra.* In the Massachusetts case the bill sought to reform a deed by making it embrace more land than the description called for, instead of less than the deed called for as in *Gillespie v. Moon.* In this particular, the Massachusetts court differentiated the case then before it from *Gillespie v. Moon*, and recognized Chancellor Kent's opinion to be the rule only when applied to a case such as was before him, namely, to a case where the bill sought to restrict the operation of the deed to a less quantity

of land than the deed called for, and not to a case where the bill seeks to enlarge the operation of the deed by adding more than the deed calls for. The general principle, in its broad application as announced by Chancellor Kent (quoted supra), is not, therefore, accepted in Massachusetts.

Whether the distinction thus drawn in *Glass v. Hulbert*, *supra*, between bills seeking on the one hand to restrict and on the other to enlarge the subject-matter of the instrument, has any application in the instant case may perhaps be a debatable question. I incline to the view that, under the facts before me, the situation is rather one where it is sought by the bill to enlarge rather than to restrict the operation of the written lease, and, this being so, the case in its facts resembles the situation in *Glass v. Hulbert, supra.* I shall not pause, however, to discuss this aspect of the case, but shall make the assumption most favorable to the defendants, viz., that the view to which I have just said I incline is the correct view.

Making this assumption, I decline to accept *Glass v. Hulbert* as controlling on the point now being considered. Notwithstanding the eminence of the tribunal which decided *Glass v. Hulbert*, I am impelled to disagree with its conclusions. I shall not enter upon a discussion of that case and its reasoning. Mr. Pomeroy in an elaborate note to *Section* 867, *p.* 1778, of *Volume* 2 of the third edition of his noted work on *Equity Jurisprudence*, analyses and discusses that case very thoroughly. His comment, announced in the text of *Section* 867 of his work, is, as follows:

"The principles which underlie the theory advocated by the Massachusetts court, if carried out to their legitimate results, would work a virtual revolution in equity jurisprudence, would confine its most salutary remedial functions within very narrow limits, and would overturn doctrines which have been regarded as settled since the earliest periods of jurisdiction. * * * The statute of frauds is no real obstacle in the way of administering equitable remedies so as to promote justice and prevent wrong. Equity does not deny nor overrule the statute; but it declares fraud or mistake creates obligations, and confers remedial rights which are not within the statutory prohibition; in respect of them the statute is uplifted."

Authorities which are not in harmony with *Glass v. Hulbert*, *supra*, but on the other hand are in accord with the language of Chancellor Kent in its broad application, are the following;

*Hitchins v. Pettingill,* 58 *N. H.* 386; *Noel's Ex'r. v. Gill, etc.,* 84. *Ky.* 241, 1 *S. W.* 428; *McCurdy v. Breathitt,* 5 *T. B. Mon. (Ky.)* 232, 17 *Am. Dec.* 65, 66; *Neininger v. State,* 50 *Ohio St.* 394, 401, 34 *N. E.* 633, 40 *Am. St. Rep.* 674; *Smith v. Allen,* 1 *N. J. Eq.* 43, 21 *Am. Dec.* 33; *Hendrickson, et al., v. Ivins,* 1 *N. J. Eq.* 562; *Thompson v. Marshall,* 36 *Ala.* 504, 513, 76 *Am. Dec.* 328; *Mc-Donald, et al., v. Yungbluth, et al., (C. C.)* 46 *Fed.* 836; *Philpott v. Elliott,* 4 *Md. Ch.* 273; *Murphy v. Rooney,* 45 *Cal.* 78; *Beardsley v. Duntley,* 69 *N. Y.* 577, 582; *Workman v. Guthrie,* 29 *Pa.* 495, 510, 72 *Am. Dec.* 654; *Ackerlind v. United States,* 240 *U. S.* 531, 36 *Sup. Ct.* 438, 60 *L. Ed.* 703; 2 *Pomeroy's Equity Jurisprudence,* (4th Ed.) § 866; 25 *R. C. L.,* § 360, *p.* 715; 1 *Story's Equity Jurisprudence,* (14th Ed.) § 233, and note thereto.

The defendants cite cases from other states which are in conflict with the foregoing. But the weight of authority appears clearly to be in favor of granting relief notwithstanding the statute of frauds and without regard to whether the relief sought is affirmative or defensive, or whether the proposed reformation will either restrict or enlarge the subject-matter of the contract.

Some courts draw a distinction between contracts that are executed and those that are executory, holding that, while the former may be reformed so as to enlarge the subject-matter of the contract, the latter may not be. Such appears to be the rule in North Carolina (*Davis v. Ely,* 104 *N. C.* 16, 10 *S. E.* 138, 5 *L. R. A.* 810, 17 *Am. St. Rep.* 667), and in Rhode Island (*Macomber v. Peckham,* 16 *R. I.* 485, 17 *Atl.* 910). These two cases are cited by the defendants. *Safe Deposit & Trust Co. v. Diamond Coal & Coke Co.,* 234 *Pa.* 100, 83 *Atl.* 54, *L. R. A.* 1917A, 596, also cited by the defendants, when read in the light of the earlier Pennsylvania case of *Workman v. Guthrie, supra.,* to which it refers without disapproval, seems likewise to lay down the rule in that jurisdiction that a distinction is to be drawn between cases involving executed contracts on the one hand and those involving executory contracts on the other.

In the instant case, the agreement of lease is executed. It is not executory. This being so, the authorities just referred to as cited by the defendants cannot be regarded as adverse to the bill in the pending cause. I may observe that the cases of *Osborn v.*

*Phelps,* 19 *Conn.* 72, 48 *Am. Dec.* 133, and *Elder v. Elder,* 10 *Me.* 80, 25 *Am. Dec.* 205, also cited by the defendants, are likewise cases where the contract was purely executory and are therefore distinguishable in their facts from the case now before me, as they also are from *Glass v. Hulbert, supra.* Though it is to be said that in each of those cases the language of the court is so general as to apply to contracts which are executed as well as executory in character.

*Glass v. Hulbert, supra,* stands almost alone among the American authorities in deciding that, where the facts show the contract to be executed, equity will not permit parol evidence to be received in behalf of the complainant to correct a mistake in the written instrument for the purpose of enlarging its operation, the contract being within the statute of frauds.

In declining to accept the decision in that case as expressive of the correct rule of law, I wish to be understood as deciding nothing more than what the facts of the instant case call for, and that is that, the lease being executed, Chancery may, if by reason of mutual mistake its language fails to accurately embody the terms actually agreed upon, reform it in accordance with the true understanding of the parties, notwithstanding the contract is within the statute of frauds and notwithstanding also the fact that the proposed reformation will enlarge rather than restrict its operation. Whether in cases where the contract is executory the court may on the ground of mistake reform the instrument and decree its specific performance in its reformed condition, there being no elements of special equities such as part performance, and the statute of frauds being applicable and relied upon, is a question which does not call for decision in this case. I, therefore, leave it as an open one in this jurisdiction.

I could rest this branch of the case on what I have heretofore said, satisfied as I am that the authorities fully sustain the jurisdiction of the court to reform the lease on the ground of mutual mistake. But another consideration appears here which, under all the authorities, clearly sustains the propriety of affording the relief asked. I refer to the circumstance that the facts show a performance of the parol agreement by the complainant, the lessor. Where such is the case, even *Glass v. Hulbert, supra,*

agrees that the case is taken out of the statute of frauds and relief may be afforded. While in some of the states, including Massachusetts, payment of the consideration is not regarded as such part performance as will remove the inhibition of the statute, such is not the rule in Delaware. *Townsend v. Houston*, 1 *Har.* 532; *Cannon v. Collins*, 3 *Del. Ch.* 132; *Matthes v. Wier*, 10 *Del. Ch.* 63, 84 *Atl.* 878. If, therefore, there was payment on the part of the town, the lessor, of that which it was to give as consideration for the surrender of the thousand feet of land by the lessee, the statute of frauds interposes no obstacle in the way of the complainant.

Now, what was the consideration which the town of Lewes was to pay? It was the acceptance of less rent than it had the right theretofore to demand. The new lease specified the smaller rental; the town collected only that sum. The town never demanded more, nor did it charge more on its books. The lessee paid only the smaller sum and never offered to pay more. It is true that the answer states a willingness to pay more. But this is a belated offer, coming after the bill was filed. It is true also that the witness Anderton, one of the defendants, testified to tendering money to the town and the town's refusal to accept it. His testimony is, however, very unsatisfactory, because he recalled neither the amount of the tender, nor what it was for, nor when it was made, except that it was made after the filing of the bill in this cause.

The thousand feet of land in dispute was, generally speaking, vacant land. The town undertook to lease it to others. In no other way could it as a practical proposition assert the right of possession. While the testimony shows that the lessees did use part of the land after the making of the new lease, yet it fails to convince me that such user was inconsistent with the right of possession in the town. In fact, it appears that the president of the Breakwater Fisheries Company, when the town was seeking to rent the land to persons outside of Lewes, protested to the town authorities, stating that if they, meaning the Fisheries Company, had known the town was going to lease the land to outsiders they never would have surrendered it.

So that it would appear not only that the town performed all

that it was to perform under the parol agreement, but it assumed to exercise the rights of a possessory owner, and did about all it could do, considering the nature of the land, in the way of taking possession.

If these facts show performance, or part performance, on the part of the town, and I think they do, then in this jurisdiction the statute of frauds presents no difficulty in the case. *Cannon v. Collins, supra.*

I have thus far discussed the case on the assumption that the oral agreement to surrender part of the land embraced in the old lease in return for a reduction of rental was, as a matter of fact, entered into as alleged by the bill. The defendants do not admit this. It is, therefore, necessary for me to examine that question and make a finding thereon.

The existence of the oral agreement is to be traced, if at all, to certain negotiations which three gentlemen, namely, Messrs. Horsey, Virden and Vessels, assumed to conduct with the town commissioners in September, 1917. At that time the old lease embracing the disputed land was held by the seven men who, through Mr. Robinson, had bought it from the Delaware Fish Oil Company, the original lessee. The three gentlemen assumed to speak for their associates, who seem to have taken the name of Breakwater Fisheries Company, which was not then, however, incorporated.. As a result of these negotiations, the evidence clearly shows that the town agreed to reduce the rental on condition of the surrender of a portion of the land. Shortly thereafter the town commissioners went down to the bay front and there met Edgar W. Ingram, another one of the group of the men who were then the owners of the old lease. In his presence, and not only without his protest, but apparently with his co-operation, they fixed the lines between what was to be retained and what was to be surrendered. Thereafter, the Mayor of the town took the description, thus made up, to Thomas R. Ingram, an officer in a bank, and asked him to draw a new lease, telling him that the paper he handed him was a description of the land to be retained and that the rest, the east end, was to be surrendered. The new lease was then drawn containing the fourth paragraph quoted above in the statement of the case, which gives rise to the pending

controversy.  The evidence shows beyond all doubt that the members of the partnership who conducted the negotiations with the Town assumed to represent, not alone themselves, but as well their associates.  As before noted, they were then using and transacting business under the name of Breakwater Fisheries Company, though they had not yet become incorporated.  The answers admit this.  That the contract for the reduction in rental and the surrender of part of the land between the Town and the seven owners of the old lease, the partnership, was made is convincingly demononstrated by the evidence.  An attentive reading of the answer will disclose that this is not denied.  It is true that the answers deny that the Breakwater Fisheries Company, a corporation, ever made any agreement.  But the denial is so phrased in the answers that it must be understood to rest solely on the legal proposition that at the time of the agreement the corporation was not in existence and therefore, no agreement could have been made binding it.  I do not understand the answers to deny that the agreement as alleged was made between the town and the partnership, which used the name of Breakwater Fisheries Company.  If I have misunderstood the answers in this regard, and if as a matter of fact they do mean to deny the making of the agreement between the town and the partnership, then it is proper for me to state that I find the evidence to be against such denial.

From the foregoing it would, therefore, appear that the question of the existence of the parol agreement as binding on the corporation, Breakwater Fisheries Company, presents purely a question of law, namely, whether the corporation, which was subsequently formed, is bound by all the terms of the agreement which the partnership made as an inducement to the town to execute the new lease?

When the old lease was bought by Mr. Robinson, he acted not alone for himself, but as well for six associates, to each of whom he duly transferred a one-seventh interest.  The seven men who then held the old lease have been spoken of as partners.  But their relation of partners was intended only to be temporary in duration, for one of them, Dr. Orr, testified that their intention was to form themselves into a corporation and conduct their affairs as such.  The partnership called itself by the same name

which the same persons subsequently used for their corporation. The stockholders of the corporation were the identical individuals who had composed the partnership, and their aliquot shares in the corporation were identical with their several interests in the partnership. Moreover, all seven of the partners became the only directors of the corporation, and were such at the time of the execution of the new lease. In negotiating with the town, the three gentlemen who assumed to speak for their associates represented to the town that they spoke for Breakwater Fisheries Company. Whether the Breakwater Fisheries Company was at that time in fact a partnership or a corporation does not appear to have been known by the town officers. As a result of the negotiations the parol agreement was made and when it was reduced to writing, ready to be executed, a corporation, Breakwater Fisheries Company, appeared therein as the lessee. The corporation thus appeared at the moment when the culmination of all preceding negotiations had been reached, and in the most formal manner executed the new lease which was intended to embody the negotiated arrangement. I am convinced that both the parties thought that the new lease did correctly embody the prior agreement, that is, not only a reduction in rental but also a surrender of the land. That such was the belief of the parties is manifest from their subsequent conduct. The town sought to rent the land supposed to be surrendered. The corporation's officers knew this and never raised any question about the town's right. Indeed, no claim of any kind was ever raised by anybody against the town's right, until nearly two years later when an attorney who examined the lease raised some question about the meaning of the fourth paragraph wherein the surrender was supposed to be provided for. In the meantime, the town charged and collected only the new, reduced rental and this is all that the company either paid or offered to pay. If the company had not thought that the old lease was canceled, I am at a loss to find a sensible motive for its entering into the new one. For if it were not canceled, the net result of the transaction from the viewpoint of the company was that, whereas before it had all the land for twelve hundred dollars a year, it would now have the same identical land and no more for the same twelve hundred dollars a year plus the increased

rental. I am forced to conclude from all the evidence that both the town and the corporation believed that the new lease was strictly in harmony with the prior agreement which had been made. Why should it not be so, when it is remembered that the corporate members were identical with the partnership members? Such being the case, full knowledge of all the antecedent negotiations was had by the corporation when its vice-president executed the new lease.

Shall the corporation now, under such a state of facts, be heard to say that it can take a portion of the contract and reject the rest? I think not. The fact that the contract was negotiated at a time before the corporation was in existence does not, under facts such as these, relieve it from the contract's terms in their entirety. When it accepted the new lease and acted solely under it, it took advantage of one-half of the bargain and, possessing full knowledge as it did, it must be held to have assumed the burden of the other half.

The defendants cite numerous cases to the effect that a corporation is not bound by contracts made in its behalf by its promoters, at a date anterior to its existence. I have examined all the cases so cited, but find none of them pertinent to facts such as appear in this case. With the correctness of the general proposition of law just stated, I take it there can be no controversy.

But that a corporation may not adopt a contract made by its promoters for its benefit, even though such contract antedates its existence, is an entirely different proposition. That it can do so, is beyond all doubt the well-established rule in this country. 1 *Machen, Modern Law of Corporations*, §§ 327-337; 1 *Fletcher, Cyc. Corp.*, § 152. To hold otherwise seems to me to be highly unreasonable. The pending case is not a case where promoters not only negotiated but themselves concluded a contract, and a question is thereafter made as to whether, or not, the corporation is bound by the contract or has by acts of its own adopted such completed contract. The case here is different; for here the promoters did the negotiating and the corporation stepped in at the end and closed the transaction by undertaking itself to conclude it.

I have no doubt that when the Breakwater Fisheries Company executed the new lease as lessee, it was bound to sur-

render the surplus land embraced in the old one.  *Carter v. Gray*, 79 *Ark.* 273, 96 *S. W.* 377; *Weathersby v. Texas & Ohio Lumber Co.*, 107 *Tex.* 474, 180 *S. W.* 735, 7 *A. L. R.* 1440; *Pratt v. Oshkosh Match Co.*, 89 *Wis.* 406, 410, 62 *N. W.* 84; *York Mfg. Co. v. Brewster*, 174 *Fed.* 566, 98 *C. C. A.* 348; *Morgan v. Bon Bon Co.*, 222 *N. Y.* 22, 118 *N. E.* 205.

From the foregoing it follows that, as against the Breakwater Fisheries Company, the case set up by the bill is fully made out.

It is now in order to consider whether the defendants, Hayes and Anderton, have such equities as will defeat the bill as against them.  These defendants claim that they are purchasers for value without notice.  The facts bearing on this branch of the case are, as follows:  On January 23, 1920, a contract was entered into whereby the Breakwater Fisheries Company agreed to sell to Hayes and Anderton its plant, including all leased land held by it, for ninety thousand dollars, payable fifteen thousand dollars in cash, ten thousand dollars on April 1, 1920, thirty thousand dollars July 1, 1920, and thirty-five thousand dollars August 1, 1920.  The cash payment was made immediately.  A little more than two weeks thereafter the original bill was filed in this case.  The Breakwater Fisheries Company was the sole defendant.  On the filing of the bill a restraining order and rule to show cause why a preliminary injunction should not issue was issued and served on the defendant February 3, 1920.  The restraining order enjoined the defendant from transferring the lease pending the hearing on the rule.  The restraining order was never vacated.  The record fails to show what disposition was made of the rule for a preliminary injunction.  On April 1, following, Hayes and Anderton paid the installment of ten thousand dollars then due, and on July 1, following, they paid the installment of thirty thousand dollars then due.  On August 4, the company extended the time of payment of the balance of thirty-five thousand dollars until October 1, "pending disposition of the injunction of the Court of Chancery."  On October 20, 1920, Hayes and Anderton appear, by the minutes of the company, to have asked further extension of time for paying the final installment until the pending case was disposed of.  On January 28, 1921, they paid thirty thousand

dollars on account of the balance, leaving five thousand dollars due. That sum has not as yet been paid.

On December 1, 1921, Hayes and Anderton were made parties to the bill.

Though the contract of sale to Hayes and Anderton was made January 23, 1920, formal transfer of the assets has not yet been made. This, I take it, is due to the outstanding restraining order.

In *Hall v. Livingston*, 3 *Del. Ch.* 348, 396, Chancellor Bates gave expression to the following:

> "To be sufficient prior notice of the trust, it must be found to satisfy a rule well settled, both in the courts of England and this country, which is this: It is upon the ground of *mala fides*, and not of mere want of caution, that the purchaser for value is affected with a prior claim, and, therefore, the notice to affect him must be more than would excite the suspicion of a cautious, and wary purchaser. It must have been so clear and undoubted, with respect to the existence of the prior right, as to make it fraudulent in him, afterwards, to take and hold the property. It is not meant by this, that a purchaser can be affected only by some direct and positive communication from the party interested; notice may be implied from circumstances; but in such case, the circumstances relied on must be clear and unequivocal, i. e., such as can be supposed to have left on the mind of the purchaser no reasonable doubt as to the existence of the prior right."

In that case the facts relied upon to establish notice were said by the Chancellor to have constituted only common rumor. And this rumor was repeated by only two persons, strangers to the transaction. And moreover, the Chancellor observed, the rumor was such as was fully answered by a deed held by the defendant's grantor. The result of his finding was that there was no evidence in the case before him justifying the conclusion that the conscience of the purchaser was affected with notice of the prior equity—nothing to impute *mala fides* to his conduct.

In the instant case the facts are such as to point to a different conclusion. Before Hayes and Anderton ever negotiated for the purchase of the Breakwater Fisheries Company's assets, they were aware that the Town of Lewes was asserting control over the disputed land. While they themselves deny the fact, yet the evidence shows that the town had on one occasion offered to lease to them a part at least, if not all, of the very land now in controversy. During the negotiations carried on between them and the Break-

water Fisheries Company for the sale of the land, they were informed by various persons that the town claimed the land. Indeed, such information was conveyed to them by the directors who represented the company in its negotiations with them. When the directors conveyed this information to Hayes and Anderton, they said, however, that the town's claim was not well founded. This assurance from interested parties seemed to satisfy Hayes and Anderton. Why they should have been so willing to accept the assurances of parties personally interested in having them accepted, I am at a loss to understand, except on the theory that they were determined to make the purchase and take their chances on any future contest with the town. If they had been actuated by that *bona fides* which the law exacts of all purchasers who seek to shield themselves by the plea that they purchased without notice, they would have made inquiry of those who knew the facts and who would not have been disposed, from motives of self-interest, to give an account biased in favor of the seller.

A reading of the lease, in its fourth paragraph, alone would have raised a question upon the very point now in controversy. The language there employed is by no means free from ambiguity. It is doubtful if the parties may not be said, by the language of that paragraph, to have provided for the surrender of the old lease. Solicitors on both sides, however, take the view that the language does not actually provide for such surrender. Whether they are correct in this, I shall not pause to consider. Certain it is, however, that the language is sufficiently obscure to raise a question in the mind as to just what it means. The lease was recorded. It was examined by an attorney representing Hayes and Anderton. They, of course, are presumed to have been cognizant of its contents.

Knowing the contents of the new lease; having had the town offer to lease them the land now claimed by them as purchasers from the Breakwater Fisheries Company at a time prior to its purchase; .having received notice from various sources, including their own vendor, of the adverse claim of the town; and having failed to make diligent and faithful inquiry from those best qualified to give information, I am persuaded under all the circumstances disclosed by the evidence that Hayes and Anderton

deliberately chose to make the purchase and take their chances with the town and its claim. When advised of the town's claim, they made inquiry of the town's adversary, but made no inquiry of the town. Mr. Hayes was advised by Daniel J. Layton, Esq., attorney for the town, that the town claimed the land and that, while the recorded lease did not show a surrender, yet as a matter of fact the town claimed the land, and claimed there had been a mistake in the lease. Mr. Anderton admits that before the purchase he was advised that the town claimed the land. My view is that under the evidence the claim of Hayes and Anderton that they are *bona fide* purchasers without notice is not sustained.

The complainant is entitled to a decree reforming the lease so as to make it conform to the agreement actually made between its parties.

It appears that formal assignment has never been made by Breakwater Fisheries Company to Hayes and Anderton of either of the leases in question. Legal title is, therefore, still held by the Breakwater Fisheries Company. That being so, the decree will direct the Breakwater Fisheries Company to execute to the complainant a deed of release surrendering all that portion of the land embraced within the terms of the old lease, and not embraced within the terms of the new lease. The decree, of course, will protect the defendants from being called on to pay any rental under the old lease. This would seem to be the most effectual way of carrying out the original intent of the parties. The costs will be taxed against the defendants.

Let a decree be entered accordingly.

Note.    On appeal the decree entered in conformity with this opinion was affirmed. The opinion of the Supreme Court will appear in 14 *Del. Ch.*