GEORGE M. COLVOCORESSES,

*vs.*

W. S. WASSERMAN CO., a corporation of the State of Delaware.

*New Castle, March* 10, 1939.

*Dudley C. Lunt* for complainant.

*Aaron Finger*, of the firm of Richards, Layton & Finger, for defendant.

THE CHANCELLOR: This case is before the court on a demurrer to the complainant's amended bill. The contract sought to be reformed is in writing, bears date February 11th, 1935, and, among other things, contemplates the exploitation of the mill tailings and mine dumps on what is known as the Congress Mine property in Arizona. When that contract was made, neither of the parties thereto owned the Congress property, but the subsequent acquisition of the title to it was made possible by its terms and by other preceding contracts relating to that property, some of which are therein referred to, and to which its provisions are subject.

The first contract, relating to the Congress property, was an "option, lease and option to purchase contract," between Byrne, Trustee, and Neil C. Clark, dated February 7th, 1935. That contract was assigned by Clark to F. W. Reid on Feburary 9th, 1935, and on the same date the contract between Reid and Colvocoresses, the complainant, relating, in part, to the exploitation of the mill tailings and mine dumps on the Congress property, was made.

The first paragraph and a part of the second paragraph of Article V of the contract between Colvocoresses, the complainant, and W. S. Wasserman Co., the defendant, sought to be reformed, provides:

"In the event Second Party acquires the tailings and dumps covered by said Congress Contract First Party shall be entitled to a five per cent (5%) non-assessable interest therein, subject, however, to Second Party's right to be reimbursed for all expenditures by it made in acquiring, developing and/or exploiting said tailings and dump material. A similar arrangement shall apply with respect to any other property (including the mine) covered by the Congress Contract, provided such property be acquired by Second Party.
\* \* \*

"Second Party will, also, appoint First Party as manager for the operation of the Congress tailings and Mine dumps, with the authority and duties usual to such a position, and with a salary of Five Hundred Dollars ($500.00) per month starting March 1st, 1935."

The third paragraph of Article V. of the written instrument, executed by the parties, also, provides:

"It is assumed that the treatment of the said tailings and dumps will require a period of approximately four years, and it is intended that the engagement of First Party as Manager of these operations shall cover approximately this period of time, but since it is recognized by both parties that conditions may arise which would make it desirable to terminate this employment, option is hereby given to either party to terminate said employment upon giving the other party thirty days' notice of intention to do so, and in the event that First Party's employment is terminated any time during the first year subsequent to the date of this agreement, he shall in addition to the Five per cent (5%) interest specified in the first Paragraph of this Article be entitled to receive from Second Party as a liquidated consideration either the sum of Twelve Thousand Dollars ($12,000.00) or, at option of First     (G.M.C. Party an additional five per cent (5%)                    (D.M.B.Jr.) non-assessable interest in all of the Congress property acquired or to be acquired by Second Party, similar in all respects to the five per cent (5%) hereinabove mentioned."

By the terms of Article V of the contract, as written and signed by the complainant and defendant, "In the event Second Party (the defendant) acquires the tailings and dumps covered by said Congress Contract," the complainant was, therefore, to receive a certain specified interest in that

property, was to be employed by the defendant as manager at a salary of $500.00 per month, or, at his election under certain circumstances, was entitled to be paid $12,000.00.

The complainant in this case sought to recover that sum in an action against the defendant in the Superior Court, but that court held that when the Congress Contract between Byrne, Trustee, and Clark, and the subsequent contracts were read in connection with the contract between the complainant and the defendant, it was apparent that the acquisition of the title to the Congress Mine property was an essential allegation in the plaintiff's declaration. *Colvocoresses v. W. S. Wasserman Co.* 8 *W. W. Harr.* (38 *Del.*) 253, 190 *A.* 607; *Colvocoresses v. W. S. Wasserman Co.* 22 *Del. Ch.* 371, 2 *A.* 2d 296.[1] In each of these cases, the complainant contended that the assignment to the plaintiff of the rights acquired by him from Reid was sufficient to give him a right of action.

The complainant now seeks to reform Article V of the instrument signed by him, claiming that the first sentence of the first paragraph of that Article should, in substance, read: "In the event Second Party (the defendant) acquires the rights and privileges under the Reid Agreement with respect to the tailings and dumps covered by said Congress Contract."

The complainant's bill, in substance, alleges that he is, and in 1935 was, a mining engineer, and after considerable investigation, beginning in 1916, became interested in the possibility of exploiting the mill tailings and mine dumps on the Congress Mine property in Arizona; that in June of 1935 he learned that that property would be open "for a lease, and option to purchase" contract, and began negotiations with regard to the tailings and dumps located thereon with one F. W. Reid, who informed him that he had an opportunity "to lease and purchase" the Congress prop-

[1] A still earlier opinion was not reported as it merely involved a construction of the contract.

erty; that on February 9th, 1935 these negotiations culminated in an agreement with Reid whereby the complainant "acquired an option on certain rights and privileges with respect to these tailings and dumps"; that during the latter part of January 1935, D. Moreau Barringer, a mining engineer, and the vice-president of the defendant company, informed the complainant "that his authority had been enlarged," and that he had been instructed by the president of Wasserman Co. to look for some small mining venture in which it could participate; that the complainant then told Barringer of his negotiations with Reid, with respect to the Congress mill tailings and mine dumps; that in the early part of February, 1935, after Barringer "had conferred" with the defendant company, his principal, he proposed to the complainant that his company be given a 20 day option to complete an investigation of those tailings and dumps, and if they turned out to be satisfactory his company would pay the $6,000, which had been posted in escrow by the complainant, be prepared immediately to start the erection of a plant, would employ your complainant as manager, at the outset, and, in addition, give him an adequate commission; that the complainant subsequently "agreed" with Barringer "as agent for the defendant" company that he should be entitled to a 5% commission on the net profits, plus a suitable cash commission, which was to be guaranteed by the defendant upon the exercise of its option; that on February 6th, 1935, the complainant dictated and had transcribed a draft of "a proposed contract," copies of which "were given to Barringer and sent to the defendant," and "this draft thereafter formed the basis of the further negotiations between your complainant and the defendant."

That the first paragraph and the first sentence of the second paragraph of Article V of that preliminary "draft" were as follows:

"In the event that Second Party exercises the Reid option and makes payment provided in Article IV. Second Party will, also, give to First Party

as further consideration for this agreement, a 5% non-assessible participation or stock interest in the Congress mill tailings and mine dumps and in such other property of the Congress Company as may later be acquired by Second Party under the terms of the Reid Agreement and of the Congress Contract.

"Second Party will also appoint First Party manager for the operations of the Congress tailings and dumps with the authority usual to such a position and with a salary of $................ per month, starting March 1st, 1935."

That thereafter "an agreement was reached" with Barringer that the complainant's salary should be $500.00 a month and should start March 1st, and in the event of the termination of his employment at any time during the first year, subsequent to the date of "their agreement," the complainant should either be paid the sum of $12,000, or an additional 5% interest in the net profits, the choice of which was to be vested in the complainant; that these terms were incorporated in "their draft of their contract after they had been confirmed by Barringer with his principal"; that on February 9th, 1935 these figures "having been discussed by Barringer with his principal and confirmed by them, your complainant and Barringer, acting as the agent of the defendant, had reached an oral agreement whereby your complainant should give to the defendant a twenty day option, and if this option should be exercised Wasserman Co. would thereby become obligated to take over the tailings and dumps under the Reid agreement, and your complainant would assign to the defendant all of his rights and privileges under the Reid agreement, and the defendant would thereupon and thereby become obligated to employ your complainant as manager from March 1st, and likewise to give him a five per cent interest in the net profits; and further, in the event of the termination of his employment during the first year of the contract, to pay him $12,000, or to give him an additional five per cent interest, as he should elect, it being clearly understood and agreed between your complainant and the defendant that the sum of $12,000.00 was to be the basic consideration of the transaction, and that any final agreement between your complainant and the defendant company should so provide."

That on February 11th, 1935, the complainant and Barringer, "acting as the agent of the defendant," conferred "* * * to prepare the final draft of the contract," and because of objections "made on behalf of the defendant," the first paragraph of Article V as it appeared in the "draft" was stricken out and the language appearing in that Article and paragraph of the contract, as finally executed, was substituted therefor; that on the same day Barringer sent a copy of that contract to the defendant, and on February 15th, 1935 "having meanwhile received from the defendant a formal authorization to execute the contract," on its behalf, the contract in question, dated February 11th, 1935, was signed by the complainant and by Barringer, on behalf of the defendant.

The bill, also, in substance, alleges that in preparing the "parol agreement," thereinabove referred to, for execution, the complainant made a mistake in that he assumed that the alterations and additions in the contract, as executed by the parties, in no wise affected or changed the obligation of the defendant to employ and to compensate him immediately upon his assignment to the defendant of his rights and privileges under the Reid agreement, and likwise in that he assumed that the phrase used in sentence I of Article V "acquires the tailings and dumps" referred to the acquisition by the defendant of the rights and privileges with respect thereto under the Reid agreement; that Barringer, acting as the agent for the defendant, either made the same mistake, and that each of them inadvertently assumed that the alterations and additions in the instrument, signed by the parties, did not alter the defendant's obligations, and that the phrase above quoted had reference to the rights and privileges which that company would acquire by virtue of the complainant's assignment to the defendant, or that Barringer, acting as the agent for the defendant, knew the contrary, and knew that the complainant was laboring under a misapprehension.

It is important to bear in mind that a court of equity has no power to alter or reform an agreement, actually made by the parties; that would, in reality, be making a new contract for them. 5 *Pom. Eq. Jur.* (*2d Ed.*) §§ 2096, 2097; *Mackenzie v. Coulson*, [1869] *L. R.*, 8 *Eq.* 368. In a proper case, equity will, however, reform a written instrument if, because of a clear, mutual mistake, it does not properly record all of the material provisions of a prior, definite and specific oral agreement made by the parties. *Colvocoresses v. Wasserman Co.*, 22 *Del. Ch.* 371, 2 *A.* 2d 296; 5 *Pom. Eq. Jur.*, (*2d Ed.*) § 2096; 5 *Willist. on Contr.*, (*Rev. Ed.*) § 1549.

*In Mackenzie v. Coulson, supra,* the court, in summarizing the rules applied in reforming instruments, aptly said:

"Courts of equity do not rectify contracts; they may, and do, rectify instruments purporting to have been made in pursuance of the terms of contracts. But it is always necessary for a plaintiff to show that there was an actual concluded contract, antecedent to the instrument which is sought to be rectified; and that such contract is inaccurately represented in the instrument."

Where the relief sought under a bill to reform a contract is based on an alleged mistake, common to both parties, such mistake must be mutual, and must be shown by evidence that is in every respect clear and convincing, and free from doubt. *Colvocoresses v. Wasserman Co.*, 22 *Del. Ch.* 371, 2 *A.* 2d 296; 5 *Pom. Eq. Jur.*, (*2d Ed.*) § 2096; 5 *Willist. on Contr.*, (*Rev. Ed.*) § 1597.

In order for a court of equity to reform a contract in writing, it has been well said, therefore, that the parties thereto must have previously "come to a complete mutual understanding of all the essential terms of their bargain, for otherwise there would be no standard by which the writing could be reformed." 5 *Willist. on Contr.*, (*Rev. Ed.*) § 1548.

When a written instrument fails to express the real intention of the parties, because of a mutual mistake as to

the real meaning of the language used, a court of equity will, also, reform that instrument, though there is no misunderstanding as to what words were actually inserted therein. *Commissioners of Lewes v. Breakwater Fisheries Co.,* 13 *Del. Ch.* 234, 117 *A.* 823; *Breakwater Fisheries Co. v. Com'rs. of Lewes,* 14 *Del. Ch.* 433, 128 *A.* 920; *Park Bros. & Co. v. Blodgett & Clapp Co.,* 64 *Conn.* 28, 29 *A.* 133; 5 *Willist. on Contr., (Rev. Ed.)* § 1585; *Restat. Contr.,* § 504.

Perhaps it may be said that knowledge by one party of the other's mistake, regarding the manner of expressing the contract, is equivalent to a mutual mistake. *Columbian Nat. Life Ins. Co. v. Black,* (10 *Cir.*) 35 *F.* 2d 571, 71 *A. L. R.* 128; 5 *Willist. on Contr., (Rev. Ed.)* § 1548; *Restat. Contr.,* § 505. And it has even been said that if, having such knowledge, one party, nevertheless, allows the other party to execute the instrument under the belief that it carries out their prior agreement, it is such inequitable conduct as to amount to fraud. *Columbian Nat. Life Ins. Co. v. Black,* (10 *Cir.*) 35 *F.* 2d. 571, 71 *A. L. R.* 128, *supra*; *Scott v. Spurr,* 169 *Ky.* 575, 184 *S. W.* 866.

In applying these principles, the important question to be determined is whether it appears from the allegations of the complainant's bill that he had, in fact, made a prior, definite and specific oral agreement with the defendant, some of the material terms of which were not correctly stated in the written instrument, subsequently executed by them, or whether, prior to the execution of that instrument, all matters under discussion were merely in the tentative or negotiating stage. See *Universal Products Co. v. Emerson,* 6 *W. W. Harr.* (36 *Del.*) 553, 179 *A.* 387, 100 *A. L. R.* 956.

All of the properly pleaded allegations of the bill are admitted by the demurrer. It therefore, appears that Barringer was the vice-president of the defendant company, and, apparently, carried on negotiations between that company and the complainant. His alleged statements to the complainant—that his authority had been enlarged and

what his instructions from the president of the Wasserman Company were, do not show agency.

The alleged offer by Barringer, with respect to the twenty day option to investigate the tailings and dumps on the Congress property, and his statement with respect to what his company would obligate itself to do if the investigation proved satisfactory, was apparently merely preliminary, though such terms were in general satisfactory to the defendant.

It, also, alleges that the complainant subsequently "agreed" with Barringer, "as agent for the defendant," that he would be paid 5% commission on the net profits and a suitable cash commission, "which was to be guaranteed by the defendant upon its exercise of its option," but it does not yet appear that the amount of that commission was agreed on.

That the negotiations were still in the preliminary stage is, also, apparent from the fact that the "draft" dictated by the complainant was not only referred to as "a proposed contract," which formed the basis of subsequent "negotiations between your complainant and the defendant," but, also, from the fact that a definite salary for the complainant, as manager, had not then been agreed on.

But the bill, also, alleges:

1. That thereafter "an agreement was reached" with Barringer, with respect to the complainant's salary and the payment of the liquidated sum of $12,000 under certain circumstances, and that these terms were incorporated in "their draft of their contract after they had been confirmed by Barringer with his principal."

2. That on February 9th, 1935 these figures "having been discussed by Barringer with his principal, and confirmed by them, your complainant and Barringer, acting as the agent of the defendant, had reached an oral agreement,"

with respect to the 20 day option, and, if it should be exercised, that Wasserman Co., the defendant, on the assignment of the complainant's rights and privileges under the Reid agreement, would become obligated to take over the tailings and dumps under that agreement; to employ the complainant as manager, and to make the various cash and other payments provided for in the bill.

3. "It being clearly understood and agreed between your complainant and the defendant that the sum of $12,000. was to be the basic consideration of the transaction, and that any final agreement between your complainant and the defendant company should so provide."

The latter allegation would seem to be more in the nature of a recital than an allegation of a specific fact. But, however that may be, and whether it appears that Barringer had any original authority to bind the defendant by contract, or not, the other allegations above quoted cannot be disregarded. A fair and reasonable interpretation of them would seem to indicate that an oral agreement, with respect to the matters in controversy, was reached by the complainant and Barringer, and that the latter's acts in that respect were, at least, ratified and confirmed by the defendant.

No actual fraud, with respect to the language used in Article V of the subsequent written instrument sought to be reformed, is alleged, but it appears that that language did not properly state the terms of the prior, definite, oral agreement.

However material the facts appearing in the bill, connected with the final draft and execution of the instrument sought to be reformed, may be at a subsequent state of this case, a question of pleading is now being considered, at which stage they are unimportant.

The demurrer to the complainant's bill is, therefore, overruled.