# COURT OF CHANCERY
## OF THE
## STATE OF DELAWARE

MORGAN T. ZURN
VICE CHANCELLOR

LEONARD L. WILLIAMS JUSTICE CENTER
500 N. KING STREET, SUITE 11400
WILMINGTON, DELAWARE 19801-3734

September 27, 2023

Joanna J. Cline, Esquire
Troutman Pepper Hamilton Sanders LLP
1313 Market Street, Suite 5100
Wilmington, DE 19801-1709

R. Montgomery Donaldson, Esquire
Montgomery McCracken Walker & Rhoads LLP
1105 N Market Street, 15th Floor
Wilmington, DE 19801

RE: ***AECOM, et al. v. SCCI National Holdings, Inc.,***
      Civil Action No. 2022-0727-MTZ

Dear Counsel:

On September 12, I heard oral argument on AECOM and URS Holdings, Inc.'s (together, "Sellers") Motion to Dismiss and Motion to Strike (the "Motion"). Sellers moved under Court of Chancery Rule 12(b)(6) to dismiss SCCI National Holdings, Inc.'s ("Buyer") Counterclaim Count III for reformation based on fraud and, in the alternative, based on mutual or unilateral mistake. Sellers also moved to strike various affirmative defenses under Court of Chancery Rule 12(f) in the event this Court granted Sellers' motion to dismiss. For the reasons that follow, I grant Sellers' motion to dismiss Count III, and deny Sellers' motion to strike.

## I.    BACKGROUND[1]

Unlike most decisions on motions to dismiss, which follow a complaint and the motion to dismiss briefing, this decision follows over 187 docket entries. Many of those recapitulate the background facts, and so I will rely on the parties' familiarity with the underlying dispute and reference only those facts necessary to adjudicate the Motion.

In 2017, AECOM purchased Shimmick Construction Company, Inc. ("Shimmick"), a California-based construction company.[2]  Shimmick's largest projects were capital intensive and required significant contributions from AECOM; some of these projects incurred significant losses.[3]  By 2019, AECOM's "board

---

[1] On Sellers' motion to dismiss, I draw all facts from Buyer's pleadings and documents integral thereto. Citations in the form of "Am. Compl." refer to Sellers' Verified First Amended Complaint, available at docket item ("D.I.") 154. Citations in the form of "Am. Ans." refer to Buyer's Verified Answer and Affirmative Defenses to Plaintiffs' Verified First Amended Complaint, available at D.I. 158. Citations in the form of "Countercl." refer to Buyer's Verified First Amended Counterclaims, available at D.I. 87. Citations in the form of "PSA" refer to the Purchase and Sale Agreement, available at D.I. 190, Ex. A. Citations in the form of "Op. Br." refer to Plaintiffs' Opening Brief in Support of Plaintiffs' Amended Motion to Dismiss and Amended Motion to Strike, available at D.I. 93. Citations in the form of "Ans. Br." refer to Buyer's Answering Brief in Opposition to Plaintiffs' Amended Motion to Dismiss and Amended Motion to Strike, available at D.I. 104. Citations in the form of "Reply Br." refer to Plaintiffs' Reply Brief In Support Of Plaintiffs' Motion to Dismiss and Motion to Strike, available at D.I. 127.

[2] Countercl. ¶ 2.

[3] *Id.* ¶ 6.

announced their approval of a plan to sell AECOM's construction services business, including Shimmick."[4]   In the "first quarter of FY2020," AECOM reclassified Shimmick as "discontinued operations."[5]  By June 2020, Shimmick's legacy project constructing the Gerald Desmond Bridge (the "GDB Project") "was in distress and unprofitable."[6]  AECOM began marketing Shimmick to prospective buyers on July 14, 2020.[7]

AECOM allegedly used "atypical, lopsided recoveries to support exaggerated soft revenue figures on GDB Project presentations, despite those inflated figures exceeding the internal figures prepared by project-level personnel by many tens of millions of dollars."[8]   "'Soft revenue' is a non-GAAP financial metric."[9]   In this context, soft revenue projection metrics are "indicative of recoverable cash flow

---

[4] *Id.* ¶ 9.

[5] *Id.* ¶ 10.

[6] *Id.* ¶ 49.

[7] *Id.* ¶ 53.

[8] *Id.* ¶ 56 (quoting D.I. 107, Ex. A at 2).

[9] *Id.* ¶ 62.

from claims against the project client."[10] AECOM purportedly misrepresented that based on its projected soft revenue, the GDB Project would "generate substantial cash flow"[11] and even be "a cash bonanza."[12] Shortly after AECOM launched its campaign, Buyer's affiliate approached AECOM to express interest in purchasing Shimmick.

"On July 22, . . . AECOM and Buyer's parent executed a non-disclosure and exclusivity agreement and began due diligence and negotiations."[13] "By the time of the sale to Buyer, AECOM served as the guarantor on approximately $1.5 billion of Shimmick's bonds,"[14] Shimmick had "mounting losses,"[15] and its share price was

---

[10] *Id.* ¶ 67 ("AECOM . . . asserted that its soft revenue projections were reliable because the soft revenue recognition process was reviewed and approved by its longtime auditor and premier global accounting firm Ernst & Young. AECOM represented to Buyer that this highly scrutinized and individualized process ensured that the soft revenue recognized on Shimmick's books was in fact indicative of recoverable cash flow.").

[11] *Id.* ¶ 68.

[12] *Id.* ¶ 67 (quoting D.I. 107, Ex. A at 2); *see id.* ¶ 89 ("[A] June 30, 2020 call between AECOM and DBO Partners show[s] that AECOM knew that the project had a contract value of $820 million, projected $1.02 billion costs at completion, and had already booked more than $60 million in losses . . . . GDB Project had a negative $81.4 million dollar margin. In October 2020, . . . for the quarter, the GDB Project had a reasonably possible loss of $10 million or more and a remote loss of $30 million or more.").

[13] *Id.* ¶ 59.

[14] *Id.* ¶ 6; *see* PSA, Seller Disclosure Schedules at 165–168. This document is not consistently paginated, so I have counted the pdf pages and reference those.

[15] Countercl. ¶ 6.

weak.[16]  Shimmick was "struggling," and Sellers and Buyer uniformly understood that its value lay primarily in the soft revenue[17] to be collected from the GDB Project.[18]

After months of negotiations, on December 9, Sellers and Buyer executed the Purchase and Sale Agreement ("PSA").[19]  As is common for the sale of an asset with an uncertain future revenue stream, the parties agreed to a de minimis base purchase price plus an earnout payment based on a contractual formula.

And as expected for most transactions, Buyer negotiated for certain financial information and the right to rely on it.[20]  The PSA provided the "Agreement and other Transaction Documents, and the Schedules and Exhibits hereto and thereto, and the Confidentiality Agreement, along with the Seller Disclosure Schedules and

---

[16] *Id.* ¶ 11 ("Flanked by a Board mandate, growing investor pressure, a weakened share price, and a looming deadline, AECOM actively marketed Shimmick . . . .").

[17] *Id.* ¶ 4 ("Because Shimmick was engaged to perform several large multi-year government projects with aggregate change orders . . . Shimmick's soft revenue was a critical component of its future cash flow and overall financial outlook.").

[18] *Id.* ¶¶ 12–14.

[19] *Id.* ¶ 16.

[20] *See Chicago Bridge & Iron Co. N.V. v. Westinghouse Elec.*, 166 A.3d 912, 932 (Del. 2017) ("The financial statement representation is the most important representation in a typical purchase agreement.").

Purchaser Disclosure Schedule" constituted the "Entire Agreement."[21]  The parties

emphasized the importance of the attached exhibits and disclosure schedules within

the Entire Agreement:  "[t]he Seller Disclosure Schedules and the Purchaser

Disclosure Schedules, and all schedules attached thereto, and all Exhibits attached

to this Agreement shall be construed with and as an integral part of this

Agreement."[22]

> The Disclosure Schedules sets forth copies of (i) pro forma unaudited combined pre-Tax income statement information of the Business for the fiscal years ended September 30, 2020 and September 30, 2019 and the eleven months ended August 31, 2020, and (ii) pro forma unaudited combined pre-Tax balance sheet information of the Business as of September 30, 2020 and September 30, 2019 and as of August 31, 2020 (collectively, and together with any notes thereto, the "Business Financial Information").[23]

Sellers represented and warranted to Buyer that the Business Financial Information,

"derived from the books and records of Seller," "fairly presents in all material

respects" Shimmick's "pre-Tax financial condition" and "the pre-Tax results of

operations of the Business for the periods indicated."[24]  And both parties agreed that

---

[21] PSA § 11.1.

[22] *Id.* § 11.2.

[23] *Id.* § 3.7(a).

[24] *Id.* § 3.7(b).

while Sellers disclaimed "any and all representations and warranties, whether express or implied," Sellers did not disclaim, and so Buyer could reasonably rely upon, "the representations and warranties contained in Article III" including the representation of and warranty for the Business Financial Information's accuracy.[25]

Sellers also provided specific figures to Buyer in setting the parameters for Buyer's earnout payment. The earnout payment amount is based on the "Retained Claim Recovery" outlined in Section 2.13 of the PSA.[26] The parties agree that Section 2.13 requires Buyer to pay Sellers an amount "calculated by subtracting unreimbursed costs and expenses incurred on the GDB Project from [GDB Claim Recoveries] . . . , then multiplying the difference by 80% until AECOM has received $64 million, and thereafter by 50%."[27]

The amount of Buyer's payment for Shimmick is based on Shimmick's Adjusted EBITDA as calculated under enumerated principles and an illustrative calculation in the Disclosure Schedules.[28] That calculation included a line item

---

[25] *Id.* § 4.11(b).

[26] *Id.* § 2.12.

[27] Ans. Br. 11; PSA § 2.13.

[28] PSA § 1.1 (defining adjusted EBITDA by "Section 1.1(a)(i) of the Seller Disclosure Schedules [which] sets forth principles for calculation of Adjusted EBITDA."); *id.*, Seller Disclosure Schedules § 1.1(a)(i) (providing "Principles for Calculation of Adjusted EBITDA"); *id.* § 1.1(a)(i)(5) (outlining one calculation principle to be that "Adjusted

showing the GDB Project producing $210.4 million in Soft Revenue.[29]   That

reference to $210.4 million was not the first time Buyer saw that figure; Sellers

"continually represented to Buyer that [Shimmick] would recover between $200–

$210 million for these claims and costs would be minimal."[30]

Notwithstanding Sellers' representations in the PSA and Disclosure

Schedules, the parties approached the transaction with different expectations about

Shimmick's soft revenue.  "AECOM knew that [Shimmick] was unlikely to recover

anywhere near that amount of soft revenue and heavily discounted the value of the

GDB Project claims in other documents not shared with Buyer."[31]   AECOM

estimated in "an August 2020 Job Status Report for the GDB Project" "probable

revenue of $127 million for the GDB Project claims"; and, in both the September

---

EBITDA and Contract Revenue shall include the Business' proportional share of Soft Revenue.  Soft Revenue shall include categories set forth in Section 1.1(a)(ii) of the Seller Disclosure Schedules . . . "); *id.* § 1.1 (explaining Section 1.1(a)(ii) "sets forth an illustrative calculation of [Shimmick's] Adjusted EBITDA . . . for the fiscal year ended September 30, 2020"); *id.*, Seller Disclosure Schedules at 207 (including as a category the "Unconsolidated EAC Soft Revenue" for the "Gerald Desmond Bridge" and showing the GDB Project producing $210.4 million in Soft Revenue recoveries).

[29] *Id.*, "Seller Disclosure Schedules" at 207.

[30] Countercl. ¶ 75.

[31] *Id.* ¶ 76.

and October 2020 Job Status Reports, AECOM estimated "$131 million of probable revenue for the same GDB Project claims."[32]

The parties also approached the transaction with different expectations about Shimmick's post-earnout profitability. Based on the GDB Project's $210 million in soft revenue, Buyer believed Shimmick would keep approximately $16 million of profit[33] from the GDB claim recoveries, and that it "would [only] pay out a portion of revenues to the extent Shimmick would not incur losses as a result."[34] But Sellers knew that $16.5 million of profit "[would] need to be reversed."[35] Sellers anticipated

---

[32] *Id.* ¶ 70.

[33] *See id.* ¶ 14 ("AECOM also represented that the GDB Project had generated approximately $16 million of profit for Shimmick."); *see also id.* ¶ 112 ("Shimmick would keep 20% of that amount, equal to $16 million, plus costs and expenses.").

[34] *Id.* ¶ 143; *see id.* ¶ 85 ("The file calculated total possible soft revenue of $210.4 million—approximately the same number included in the September WIP—by simply subtracting contract value from EAC expenses. In other words, the soft revenue was not related to change orders or claims, as had been represented to Buyer, but instead was equal to the difference between the GDB Project's estimated costs and the money to which the Joint Venture was contractually entitled. That is, the exact amount of money needed for the GDB Project to break even."); *id.* ¶ 112 ("When read in conjunction with AECOM's representations that the GDB Project would produce over $210 million of soft revenue for the Joint Venture, Section 2.13(a)(i) gave Buyer the right to approximately $18 million plus costs and expenses. At the lower end of the range, if the Joint Venture received $200 million, Shimmick would be entitled to $80 million, or 40%. Shimmick would keep 20% of that amount, equal to $16 million, plus costs and expenses.").

[35] *Id.* ¶ 95; *see also id.* ¶ 84 ("AECOM concealed this updated information, which further suggested that its previously represented soft revenue figures of $210 million were wildly off, and never corrected its prior representations, upon which it knew Buyer was relying.").

they would be fully compensated, but that Shimmick would not break even, and would certainly not turn a profit.[36]

The transaction closed in January 2021.[37] At the end of that year, the GDB Project generated approximately $130 million in soft revenue—not $210 million as represented in Sellers' disclosure schedules.[38] "[I]ncidentally, this amount was exactly in line with AECOM's internal projections . . . ."[39]

Buyer has not paid Sellers any earnout payment, on the grounds that because Shimmick did not profit from the GDB claim recoveries, Buyer does not owe any funds to Sellers. The parties volleyed about the issue through the summer of 2022. In August 2022, Sellers filed this lawsuit.

Sellers "seek[] a portion of net recoveries on the GDB Project" as set out in Section 2.13(a)(i).[40] Buyer presses counterclaims for fraud and for reformation. Buyer also asserts various affirmative defenses, including (i) Sellers' claims are barred by the doctrine of unclean hands; (ii) Sellers' claims are barred by Sellers'

---

[36] *Id.* ("Even under the [Sellers'] optimistic scenario, the [GDB] Project still had a negative margin of $2.4 million.").

[37] *Id.* ¶ 114.

[38] *Id.* ¶¶ 12–15.

[39] *Id.* ¶ 118.

[40] *Id.* ¶ 111.

own fraud; and (iii) Sellers' material breach of the PSA suspended Buyer's performance obligations thereunder.[41]  Sellers moved to dismiss those counterclaims and strike those affirmative defenses, and the parties briefed the Motions.[42]  At oral argument on September 12, I denied the motion to dismiss Buyer's fraud count.[43]

## II.   ANALYSIS

### A.   Motion To Dismiss

Buyer's reformation count seeks "to clarify the claims-sharing scheme already laid out in Section 2.13 so that Buyer may retain $16 million plus expenses from funds received for GDB Claims."[44]  Buyer seeks to reform Section 2.13 to reflect that Buyer "would [only] pay out a portion of revenues" of the GDB Project "to the extent Shimmick would not incur losses as a result."[45]  Buyer seeks reformation based on either mutual mistake, unilateral mistake, or fraud.[46]  Sellers moved to dismiss for failure to state a claim under Court of Chancery Rule 12(b)(6).

---

[41] Am. Ans. 64.

[42] Op. Br.

[43] D.I. 188; D.I. 192.

[44] Ans. Br. 30.

[45] Countercl. ¶ 143.

[46] Ans. Br. 23.

I begin by pausing to note that having pled a claim for fraud and sought reformation as a remedy for that fraud, Buyer need not plead a standalone claim for reformation in order to obtain it for fraud. A plaintiff who has pled a claim for fraud, which reformation might remedy, need not plead a formal count for reformation: she need only convince the Court that reformation is the proper remedy.[47] As in *James River-Pennington Inc. v. CRSS Capital, Inc.*, as explained in my bench ruling at oral argument, Buyer pled with sufficient particularity a claim for fraud based on

---

[47] *Brinckerhoff v. Enbridge Energy*, 2012 WL 1931242, at *2, *4 (Del. Ch. May 25, 2012) (finding the complaint states a claim that "could lead to a reformation remedy," even when the complaint did not allege a separate discrete claim in the cause of action for reformation, but explaining that the plaintiff still had to request reformation as a remedy); *Brinckerhoff v. Enbridge Energy* ("*Brinckerhoff IV*"), 159 A.3d 242, 261–62 (Del. 2017) (concluding "the Court of Chancery viewed its remedial authority too narrowly in its ability to assert reformation as a remedy, and holding that the plaintiff pled a viable claim that could lead to a reformation remedy and that "once liability has been found, and the court's powers shift to the appropriate remedy, the Court of Chancery has broad discretion to craft a remedy to address the wrong" and "whether an equitable remedy should be ordered will depend on the Vice Chancellor's assessment of the equities"); *Mesirov v. Enbridge Energy*, 2018 WL 4182204, at *6 (Del. Ch. Aug. 29, 2018) (interpreting *Brinckerhoff IV* to provide that reformation or recission remain viable equitable remedies that may be awarded in the Court's discretion upon a finding of breach, and noting that "reformation or recission remain viable equitable remedies that may be awarded in the Court's discretion upon a finding of breach"); *see also Haney v. Blackhawk Network Hldgs.*, 2016 WL 769595, at *10 (Del. Ch. Feb. 26, 2016) ("To support a claim for reformation, the party seeking such form of relief must plead with particularity the ingredients on which it is based, namely mutual mistake or fraud, [under] Rule 9(b)."); *Leaf Invenergy v. Invenergy Wind*, 2018 WL 2322350, at *2 (Del. Ch. May 21, 2018) (noting an award of nominal damages instead of reformation was appropriate because while reformation is always available as a remedy even if not pled, the plaintiff had only proposed money damages).

false representations.[48]   And, as in *James River-Pennington*, "one might logically suspect reformation to be the real remedy sought by" Buyer.[49]   Count III need not state a claim for reformation to be an available remedy for Count I's claim for fraud.

In the absence of fraud, i.e. in the event Count I here fails, reformation is available to fix a mistake in the parties' contract.[50]   Against that backdrop, and with the "necessary assumption that an unambiguous written agreement is valid on its face and accurately reflects the intentions of the parties,"[51] I turn to Sellers' motion to dismiss Buyer's claim to reform the PSA to remedy mistake.   Buyer alleges that Section 2.13 "is the product of fraud, mutual mistake or unilateral mistake and should be reformed"[52] because "Buyer's and AECOM's intent in drafting Section 2.13 of the PSA was that Buyer would pay out a portion of revenues to the extent

---

[48] 1995 WL 106554, at *10 (Del. Ch. Feb. 9, 1995).

[49] *Id.* at *10–*11 (finding reformation may be available as a remedy to purchase defendant under its generalized misrepresentation counterclaim and denying seller plaintiff's motion to dismiss as to the misrepresentation counterclaim).

[50] *See Bank of Del. v. Claymont Fire Co. No. 1*, 528 A.2d 1196, 1198 (Del. 1987) ("As for reformation, the Court of Chancery observed that such relief is granted in the absence of fraud or misrepresentation only where it is demonstrated that there was a mutual mistake, or a unilateral mistake coupled with knowing silence and clear and convincing proof of the agreement to be incorporated in the reformed instrument.").

[51] *W. Willow-Bay Ct. v. Robino-Bay Ct. Plaza*, 2009 WL 3247992, at *3 (Del. Ch. Oct. 6, 2009) (citing *Cerberus Int'l, Ltd. v. Apollo Mgmt.*, L.P., 794 A.2d 1141, 1156 (Del. 2002)).

[52] Countercl. ¶ 141.

Shimmick would not incur losses as a result."[53]  This belief stemmed from Buyer's

understanding, informed by Sellers' representations, that the GDB Project would

produce $200 to $210 million of soft revenue.[54]  If this representation was accurate,

then under Section 2.13's earnout mechanism, Shimmick would have retained

between $16 and $18 million.[55]

Buyer seeks extreme and "unusual" relief:  to change the unambiguous terms

of its agreement with Sellers so that the agreement meets Buyer's expectations.[56]

"Equity respects freedom to contract," and so this Court will not rewrite a contract

to save parties from the unhappy consequences of a bond that they voluntarily

imposed upon themselves.[57]  Before this Court will grant "the high remedy of

reformation, the claimant must not only establish that the written agreement was not

the agreement intended by the parties, but also what was the agreement contemplated

by them when executed."[58]  Equity will not supply the exceptional remedy of

---

[53] *Id.* ¶ 143.

[54] *Id.* ¶ 112.

[55] *Id.*

[56] *See* 27 Richard A. Lord, *Williston on Contracts* § 70:94 (4th ed.) [hereinafter "*Williston on Contracts*"].

[57] *Martin Marietta Mat'ls v. Vulcan Mat'ls*, 2012 WL 1605146, at *58 n.283 (Del. Ch. Sept. 23, 1999).

[58] 27 *Williston on Contracts* § 70:94.

reformation to accommodate negligence,[59] or unilateral mistake without knowing silence,[60] or a party's dissatisfaction with agreed-upon terms.[61] Reformation is only available "when the contract does not represent the parties' intent because of fraud, mutual mistake or, in exceptional cases, unilateral mistake coupled with the other parties' knowing silence."[62] Put another way, reformation is not an over-the-counter analgesic to imprecisely block the pain of a bad deal; rather, it is a precise prescription intervention to ensure the deal is what the parties agreed upon.[63]

When considering a motion to dismiss under Rule 12(b)(6), courts will accept "all well-pleaded factual allegations as true"[64] and accept "even vague allegations in

---

[59] *Heartland Del. v. Rehoboth Mall*, 57 A.3d 917, 923 (Del. Ch. 2012).

[60] *See Colvocoresses v. W.S. Wasserman Co.* ("*Colvocoresses II*"), 28 A.2d 588, 589 (Del. Ch. Oct. 16, 1942) ("In the absence of some element of fraud, such a mistake must be mutual and common to both parties; a mere unilateral mistake is not within the rule . . . [except] when the mistake of one party, with respect to the meaning of some material provision of the signed contract, is accompanied not only by the other party's knowledge thereof, but, also, by his silence."); *see also James River-Pennington*, 1995 WL 106554, at *7 ("Reformation is appropriate only when the contract does not represent the parties' intent because of . . . a unilateral mistake coupled with the other parties' knowing silence.").

[61] *See Heartland Del.*, 57 A.3d at 923; *see also CC Fin. v. Wireless Prop.*, 2012 WL 4862337, at *6 (Del. Ch. Oct. 1, 2012) (asserting equity cannot "save a party from its own negligence").

[62] *James River-Pennington*, 1995 WL 106554, at *7.

[63] *Colvocoresses II*, 28 A.2d at 589 (asserting the purpose of reformation "is to make an erroneous instrument express correctly the real agreement between the parties").

[64] *Prairie Cap. III v. Double E Hldg.*, 132 A.3d 35, 49 (Del. Ch. 2015).

the Complaint as 'well-pleaded,' if they provide the defendant notice of the claim."[65]

All reasonable inferences will be drawn in favor of the non-moving party.[66]

Dismissal will only be granted when it appears "the [nonmoving party] would not

be entitled to recover under any reasonably conceivable set of circumstances."[67]  "In

all averments of fraud or mistake, the circumstances constituting fraud or mistake

shall be stated with particularity."[68]  This Court will award reformation where there

is "a clear, mutual mistake" as to the written agreement that "does not properly

record all of the material provisions" intended by the parties.[69]  "[K]nowledge by

one party of the other's mistake regarding the expression of the contract is equivalent

to a mutual mistake."[70]  To survive a motion to dismiss under Rule 12(b)(6), the

party seeking reformation based on mistake must allege with particularity:  "(i) that

the parties reached a definite agreement before executing the final contract; (ii) that

[65] *Cent. Mortg. v. Morgan Stanley Mortg. Cap. Hldgs.*, 27 A.3d 531, 536 (Del. 2011).

[66] *Prairie Cap. III*, 132 A.3d at 49.

[67] *Cent. Mortg.*, 27 A.3d at 535.

[68] *JJS, Ltd. v. Steelpoint CP Hldgs.*, 2019 WL 5092896, at *9 (Del. Ch. Oct. 11, 2019).

[69] *Colvocoresses v. W.S. Wasserman Co.* ("*Colvocoresses I*"), 4 A.2d 800, 803 (Del. Ch. Mar. 10, 1939).

[70] *Tom Savage Assocs. v. Woodbridge Sch. Dist.*, 1994 WL 165208, at *2 (Del. Super. Apr. 20, 1994) (quoting 13 *Williston on Contracts* § 1548 (3d ed. 1970)).

the final contract failed to incorporate the terms of the agreement;"[71] (iii) that the parties were "similarly mistaken or that [one] knew of [another's] mistake and remained silent;"[72] and (iv) "the precise mistake the parties made."[73] The requirements are cumulative, and each one must be pled with particularity.[74] Failure to satisfy one requirement is fatal to the claim.[75] I begin and end with the first element of a definite prior understanding.

"In order for a court of equity to reform a contract in writing," the plaintiff must demonstrate that the parties had "a complete mutual understanding of all the essential terms of their bargain, for otherwise there would be no standard by which

---

[71] *Great-W. Invs. v. Thomas H. Lee P'rs, L.P.*, 2011 WL 284992, at *11 (Del. Ch. Jan. 14, 2011) (identifying four elements necessary for a claim of reformation based on mutual mistake to a survive Rule 12(b)(6) motion to dismiss).

[72] *Cerberus Int'l v. Apollo Mgmt.*, 794 A.2d 1141, 1152 (Del. 2002) ("Thus, Cerberus must show that: (i) MTI thought that the merger agreement gave MTI's stockholders the proceeds of the options and warrants; (ii) either that Apollo was also similarly mistaken, or that Apollo knew of MTI's mistake and remained silent; and (iii) that MTI and Apollo had specifically agreed that the proceeds of the options and warrants would go to MTI's stockholders.").

[73] *Great-W. Invs.*, 2011 WL 284992, at *11.

[74] *Cerberus Int'l*, 794 A.2d at 1153 ("Courts generally assign the . . . burden to the entire request for reformation, rather than to the specific 'prior agreement' element of mutual (or unilateral) mistake claim.").

[75] *Interim Healthcare v. Sherion Corp.*, 2003 WL 22902879, at *8 (Del. Ch. Nov. 19, 2003); *see also In re TIBCO Software Inc. S'holder Litig.*, 2014 WL 6674444, at *16 (Del. Ch. Nov. 25, 2014).

the writing could be reformed."[76] Regardless of whether a party pleads reformation for mutual mistake or unilateral mistake plus knowing silence, the party must establish "that the parties came to a specific prior understanding."[77] The prior understanding "tells the Court of Chancery exactly what terms to insert in the contract rather than being put in the position of creating a contract for the parties."[78] In other words, the requirement to plead the actual agreement between the parties elucidates the specific correction the Court must make to their written agreement.[79]

---

[76] *Colvocoresses I*, 4 A.2d at 803.

[77] *ASB Allegiance Real Est. Fund v. Scion Breckenridge Managing Member, LLC*, 2012 WL 1869416, at *13 (Del. Ch. May 16, 2012) (quoting *In re Tavel*, 661 A.2d 1061, 1070 n.5 (Del. 1995)).

[78] *Id.* at *13 (internal quotation marks removed).

[79] Because reformation conforms a contract to the parties' actual understanding, it requires a prior understanding. In the absence of a prior understanding, the remedy is rescission, which breaks a contractual bond that was never formed in the first place. *Scion Breckenridge Managing Member, LLC v. ASB Allegiance Real Estate Fund*, 68 A.3d 665, 677 (Del. 2013) ("Avoidance and reformation are fundamentally different remedies. Avoiding or rescinding a contract essentially results in the abrogation or unmaking of an agreement and attempts to return the parties to the status quo ante. In contrast, reformation does not unmake an agreement; it corrects an enforceable agreement's written embodiment to reflect the parties' true agreement." (internal quotation marks removed)). Mistake following a prior understanding supports reformation; mistake without a prior understanding supports rescission. *See, e.g., Burge v. Fid. Bond & Mortg. Co.*, 648 A.2d 414, 420 (Del. 1994) ("In the law of contracts, a party is permitted to rescind an agreement based upon its unilateral mistake when: (1) enforcement of the agreement would be unconscionable; (2) the mistake relates to the substance of the consideration; (3) the mistake occurred regardless of the exercise of ordinary care; and (4) it is possible to place the other party in the status quo.").

*West Willow-Bay v. Robino-Bay Plaza* is a good example of how comparing a specific prior agreement and the agreement as written can and should identify the term to be altered. There, the parties to a purchase agreement set about amending it, with a memorandum of understanding as a first step.[80] The memorandum characterized the defendant's "obligation to secure land use approvals as one requiring only 'best efforts.'"[81] But the amendment incorporated an "unconditional" standard instead.[82] The defendant signed the amendment without noticing he was now "unconditionally obligated to obtain the necessary land use approvals from third parties."[83] This Court considered "whether the Second Amendment should be reformed to incorporate a 'best efforts' standard by which to measure [the defendant's] attempts to obtain [a third party's] consent to the proposed . . . project."[84] This Court found that "the memorandum of understanding evidences that both [parties] had a prior specific understanding that [defendant's] efforts to obtain

---

[80] 2009 WL 3247992, at *2.

[81] *Id.* at *2.

[82] *Id.* at *3, *6.

[83] *Id.* at *3.

[84] *Id.*

third-party consents were not unconditional, but instead would be governed by a less rigorous-even if not clearly defined-best efforts standard."[85]

Here, Buyer avers reforming Section 2.13 "will give Buyer the benefit of its bargain had Sellers' representations in Section 3.7(b) been true."[86] But Buyer does not allege any prior agreement as to how obligations under Section 2.13 might change depending on Shimmick's soft revenue from the GDB Project. Buyer never expressly articulates how its request to reform Section 2.13 (as opposed to any other section) stems from a specific agreement between the parties. Buyer has not alleged any "agreement" that Section 2.13 earnout payments are entirely conditioned upon Buyer breaking even, in the event soft revenue projections were inaccurate or some other circumstance caused soft revenue to fall below $200 million. Put another way, Buyer has not pled any prior agreement that is inconsistent with Section 2.13 as written. Indeed, Buyer's and Sellers' descriptions of Section 2.13 and what it expresses are identical.[87] Their agreement reflects what's written, and what's written

---

[85] *Id.* at * 6.

[86] Ans. Br. 30.

[87] *See id.* at 11; *see also* Am. Compl. ¶¶ 35–45; PSA § 2.13.

reflects their agreement. Buyer offers no prior agreement to which I could contrast and conform Section 2.13's terms.

Buyer argues reformation of Section 2.13 "will give Buyer the benefit of its bargain had Sellers' representations in Section 3.7(b) been true."[88] But Buyer's expectation is based on Sellers' representation that soft revenue would amount to $210 million—not any actual agreement between the parties as to what amount Shimmick would retain after paying Sellers. The discrepancy between Shimmick's expected benefit and actual outcome is sourced in underlying financial information, not Section 2.13's terms or language. Buyer has failed to point to any particular prior agreement between the parties that differs from Section 2.13.[89]

Indeed, the facts as Buyer pled them, in which Sellers misrepresented the GDB Project's anticipated soft revenue, are wholly inconsistent with a meeting of the minds in a prior understanding. By Buyer's allegations, Sellers did not actually believe the GDB Project was a "cash bonanza," and believed soft revenue would be

---

[88] Ans. Br. 30.

[89] *Colvocoresses I*, 4 A.2d at 803; *see also BAE Sys. N. Am. Inc. v. Lockheed Martin Corp.*, 2004 WL 1739522, at *6 (Del. Ch. Aug. 3, 2004) (asserting that for a pleading of mistake to survive, the party must "allege with particularity some form of specific prior agreement").

closer to the actual $130 million than the disclosed $210 million.[90] Sellers therefore could not have agreed that Section 2.13 was conditioned upon the GDB Project achieving at least "$200 million of soft revenue on already-earned change orders and claims."[91] As alleged, Sellers knew Shimmick would fall short of the figures Sellers represented to Buyer, and Sellers intended to receive all of Shimmick's soft revenue from Buyer. Buyer relied on the higher figures Sellers provided, intended to profit from that soft revenue, and only then pay Sellers. This dynamic does not represent a prior understanding; there was never a meeting of the minds. Buyer has not successfully alleged with particularity that Buyer and Sellers agreed to Section 2.13's contingency on the accuracy of the soft revenue projections or Business Financial Information.

A plaintiff's inability to allege "a definitive agreement of the parties to which the Court can refer when forming the Agreement" is fatal to a claim for reformation based on mistake, regardless of whether the mistake is mutual or unilateral coupled with knowing silence.[92] Buyer has not succeeded in pointing to a definitive, clear

---

[90] Countercl. ¶ 58 (quoting D.I. 107, Ex. A at 2); *see also id.* ¶ 79.

[91] *Id*. ¶ 118.

[92] *Interim Healthcare*, 2003 WL 22902879, at *8.

and particular agreement to which this Court can compare Section 2.13 as it is written. And because Buyer and Sellers never came to an agreement on how Section 2.13 would play out based on projected soft revenues, there can be no claim to reform the PSA to reflect that agreement. Sellers' motion to dismiss Count III is granted.

### B.    Motion to Strike

Under Court of Chancery Rule 12(f), Sellers moved to strike Buyer's second, third and fourth affirmative defenses on the condition that Sellers' motion to dismiss is granted. As to Buyer's second and third affirmative defenses, these sound in fraud and in Buyer's Counterclaim Count I; for the reasons stated in my September 12 bench ruling, Sellers' motion to strike is denied.

I address separately Buyer's fourth affirmative defense, which states that "Sellers' material breach of the PSA suspended Buyer's performance obligations thereunder."[93]    "Generally, motions to strike are not favored and are granted sparingly;"[94] but under Rule 12(f), "the Court may order stricken from any pleading any insufficient defense or any redundant, immaterial, impertinent, or scandalous

---

[93] Am. Ans. 64.

[94] *Columbus Life Ins. v. Wilm. Tr.*, 2021 WL 537117, at *5 (Del. Super. Feb. 15, 2021).

matter."[95] "The test employed in determining a motion to strike is: (1) whether the challenged averments are relevant to an issue in the case and (2) whether they are unduly prejudicial."[96]

Sellers contend Buyer's affirmative defense of prior material breach must be stricken because Buyer withdrew its counterclaim that Sellers breached the PSA. Buyer voluntarily withdrew its breach of contract claim after Sellers moved to dismiss it on the grounds that the Buyer's sole remedy under the PSA is indemnification.[97] From there, Sellers maintain that Buyer's fourth affirmative defense must be stricken because the PSA's survival clause bars any claim for breach.[98] The parties agree that Delaware law permits an affirmative defense, intended to bar recovery, where the same facts presented as a counterclaim seeking a recovery would be barred by laches.[99] They cursorily disagree as to the fate of that

---

[95] Ct. Ch. R. 12(f).

[96] *Salem Church (Del.) Assocs. v. New Castle Cnty.*, 2004 WL 1087341, at *2 (Del. Ch. May 6, 2004).

[97] Ans. Br. 3.

[98] Reply Br. 17.

[99] *Winklevoss Cap. Fund v. Shaw*, 2019 WL 994534, at *7 (Del. Ch. Mar. 1, 2019).

affirmative defense when that counterclaim is barred by a survival clause: Buyer devotes a footnote, and Sellers devote a paragraph.[100]

Sellers offer no legal support for the proposition that a survival clause bars an affirmative defense of prior material breach; they simply argue neither of Buyer's authorities provide that the defense survives.[101] Sellers may be reading those cases too narrowly. One of them, *Winklevoss Capital Fund v. Shaw*, quotes the Superior Court as providing that "a defendant may amend a pleading to assert an affirmative defense, even where the statute of limitations *or other considerations* would bar the assertion of a substantially similar counterclaim."[102] Sellers' paragraph on this issue fails to demonstrate that Buyer's affirmative defense of prior material breach is irrelevant or barred by contract. Sellers have offered no basis to bar Buyer from pressing Sellers' failure to honor the PSA "as grounds to defend against [Sellers'] claim that [Buyer] ha[s] not delivered all that was promised."[103] And Sellers have not attempted to assert the defense is prejudicial.[104] I cannot see how it could be.

---

[100] Ans. Br. 32 n.13; Reply Br. 17.

[101] Reply Br. 17.

[102] 2019 WL 994534, at *10 n.95 (emphasis added) (quoting *King Const. v. Plaza Four Realty*, 2012 WL 35181215 at *4 (Del. Super. Aug. 7, 2012)).

[103] *Id.* at *10.

[104] Reply Br. 17.

"If [Sellers] press for a decision on the merits before trial, the [defense] may be found to be without basis. [But it] . . . may not be stricken as an insufficient defense. Nor should its validity be determined upon a motion to strike."[105]

## III. CONCLUSION

Sellers' motion to dismiss Buyer's Counterclaim Count III is granted in part. Counterclaim Count III is dismissed with prejudice; reformation is dismissed as an actionable claim. Reformation may still be available as a remedy for Buyer's Counterclaim Count I for fraud, should the claim be proven and a remedy be necessary. Sellers' motion to strike Buyer's second, third and fourth affirmative defenses is denied. To the extent an order is required to implement this decision, **IT IS SO ORDERED**.

Sincerely,

*/s/ Morgan T. Zurn*

Vice Chancellor

MTZ/ms

cc: All Counsel of Record, via *File & ServeXpress*

---

[105] *Vets Welding Shop v. Nix*, 1988 WL 67703, at *3 (Del. Super. June 20, 1988).